All right, we'll call the next case of the morning, which is, I'm not sure about the fellow's last name, whether it's Jaimes or Sierra versus Tapasco or Riascos, I suppose, and you'll have to clarify that for us, please, number 1620660, hear from Mr. Jones. And please, the court. Yes, sir. Good morning. My name is James R. Jones, and I have the honor to represent Miss Nasly Jimena Riascos Tapasco in this case. Your honors, this is a appeal of a case from the Southern District of Texas involving the Hague Convention, wherein the petitioner has alleged that the child KGR was wrongfully removed from her habitual residence in Mexico. We have two issues today before the court. First of all, that the district court erred in not granting our motion to dismiss on grounds of forum nonconvenience because the court did not have the jurisdiction to adjudicate this fundamental issue in this case, which is the parentage of the child. Secondly, that the facts do not unequivocally show, as that term was described in Larbee, that Mexico was to become her habitual residence. On the first point, your honors, it's undisputed that these people were never married. The child was born in 2009 in Mecklenburg, North Carolina, where she resided with her mother until October of 2012. At that time, Mr. Sierra was excluded from the United States. He had been arrested in Mecklenburg, North Carolina, for domestic assault on my client. In fact, at the time the child was born, my client had not heard from Mr. Sierra in some time, three months I think at least, until she was notified that he was in jail in Atlanta, Georgia, charged with conspiracy to commit money laundering and possession of an illegal weapon. Mr. Sierra was also in this country unlawfully. The point is, because the parents were not married, there's no legal presumption that this child was not married. Why do you call him a parent if he's not the father? Well, for sakes of convenience, Judge. Well, I'm sorry, but it seems to me you've just pled yourself out of court on that. He's also named on the birth certificate, correct? That's true, Judge, but that only makes him the father if he complies with the other stipulations in the Uniform Parentage Act, which is found at 160.204 of the Texas Family Code. He would have to be married to the mother either before or after the birth of the child for that to make him the father. What? That's correct, Your Honor. 160.204 is the law. Why would a Texas court even adjudicate this since it has nothing but fortuity to do with Texas? Because at the time that this suit was filed, my client and the child were residents of the state of Texas. Well, I understand that at the time. Where's your client now? She lives in Montgomery County, Texas, Your Honor. In Montgomery County? Yes, ma'am. She's legal? Yes, she's a legal resident alien, and the child resided with her until September of last year when the — But when he was deported, she allowed him to go with the father, we'll call him, since she referred to him as a father in a hearing. She did, Your Honor, and I think — With a judicial admission. I don't know that — and I addressed that in my brief, Judge. I don't think we can create parentage by estoppel here. The sole means of establishing parentage is under the Uniform Parentage Act, found at Section 160 of the Texas Family Code. If that were the case — This is on summary — no, this went to trial, right? It did, Your Honor. Well, if you had some objection to parentage, it seems to me you could have gone through the processes in the district court and gotten a DNA test. The district court has no jurisdiction to do that. I know it, quote, has no jurisdiction, but at the same time, this is not a serious issue, frankly. We consider it the central issue in the case, Judge. I think it's a lie, and frankly, and, you know, your client is in deep trouble if she's lying to the court, saying that this man is not the father. You don't put the fellow's name on the birth certificate if he's not the father. I don't know how the name got on the birth certificate, Judge. Mr. Sierra was certainly not present when the child was born. But the point is — Well, that makes it even more obvious. The mother was there. But she gave the kid back to him several times. She had several opportunities to take the child back to Texas with her, and she availed herself of none of them. Well, she did take that opportunity, Judge, and brought the child back from Mexico, and that's why this petition was filed by Mr. Sierra. Well, yeah, when she — I mean, the circumstances are certainly disputed about what happened in July, but she didn't tell him she was coming down for the birthday party. Well, she arrived down there for the birthday party and saw the condition the child was in, became alarmed enough to take the child back to — about six or seven months earlier to take the child back, and she declined every time. The child was sent to Mexico to begin with, Your Honor, because she was having problems with her speech, and there was a program available in Mexico to help the child with her speech, and that was the reason she went back with Mr. Sierra to begin with. But we still feel that the issue of parentage here is major. It's the fundamental right that a child should know who her father is. Yeah, but don't the cases say that in a Hague Convention case, parentage is irrelevant? Well, the Hague Convention speaks of custodial rights, Your Honor. No, no, but don't the cases say that, that really the issue is whether there was a shared intent for the child to reside out of the country? That's certainly true, Judge, and that's our second point of error here. But the Hague Convention speaks of custodial rights, and to paraphrase, they arise from a legal relationship. Until there is a legal relationship between parent and child, no custodial rights exist. Well, isn't there a place to litigate that in the state court? Pardon me, Judge? A place to litigate that, though, is in the state court, and you tried to do that. Absolutely, Your Honor. In fact, we had filed a petition in the 418th District Court of Montgomery County. No, no, but parentage. Parentage. You can litigate that in the state court. That's the exclusive providence of the state court. It's the exclusive jurisdiction of the state court, Your Honor. In fact, we had filed a petition there. All Mr. Sierra would have had to do, if he were interested in resolving this thing, was to file an appearance in the state court. You know what? If he wasn't the parent, I suppose you should have notified the authorities and said that he was a — had kidnapped the girl. And that may well be. But she didn't do that. This is just — I mean, obviously, the Hague Convention presupposes that it is a dispute between parents, okay, or people with custodial rights over a child. No question about it. But every single step of your lawsuit, except for this claim that the man on the birth certificate is not the father, every single step of your — basically concedes that your client was allowing the child to live with him. Period. And therefore, the predicate for the Hague Convention is essentially established. I don't know that that's true, Judge. I would just — Well, it's either that or he's kidnapped her. There's only two ways about it. Well, I suppose that could be true, Judge. But as I said, the Hague Convention refers to custodial rights arising from a legal — You're not going to make new law about parentage in a case where your client testified on the stand, you know, had all these opportunities to take the little girl back to Houston and never, never once did it. Well, she finally did, Judge. Well, she finally spirited her away, evidently, but — Well, her testimony was the condition she found the child in required her to bring the child back, and that's why she did it. But, Your Honor, with all due respect, I submit that the issue of parentage is paramount here. Isn't she back in Mexico now? The child remains in Mexico, the district court — That's right, because there was — you didn't even get a stay. I asked for a stay, and the judge denied that, Your Honor. That's in the record on September 29, 2016, when the judge — Right, and you could have come to the Fifth Circuit for a stay. It wouldn't have gone to this panel. It would have gone to another panel. So, you know, our reaction has nothing to do with that. That was true, Judge. We could have done that, but by the time we would have been able to prepare that, get it filed with the court, the district court's order would have already been executed and the child back in Mexico. We didn't feel it would be — You know, as I said, the only real issue is whether there's — the evidence was sufficient for the district court to find that both parents agreed that the child's residence was now in Mexico. Given all those trips and letters of authorization she signed. So if you've got an argument on that, I'd like to hear it. Wait, Your Honor, a second point. The judge and the district court relied on that travel as authorization. It was nothing more than that, an authorization to travel. It did not say, I consent to the child living in Mexico permanently. I do not agree that this is her habitual residence. In fact, all she did was comply with the recommendations of the Department of Homeland Security and I've cited that portion in our brief where if the one parent is traveling outside the country with a child, many countries require a written travel authorization from the parent who is not present. This is done in family cases all the time to assuage the problem of child abduction. But then time goes by and she goes down there about once a year and, you know —  That's true, Judge. Being separated from your toddler at this point of her life is just hard for a mother, and two of us are mothers, to even conceive of. I agree, Your Honor. It certainly was, and my client was certainly stressed out about that. But to move on to the second point as to whether or not there was a shared intent, the testimony in the trial court was completely conflicting. My client testified that the child was to return when she was four years old, which would have been about a year after she went to Mexico. And Mr. Sierra said there was no agreement as to the amount of time the child was to live there. There was no meeting of the minds here or no shared intent as a matter of law. As far as the travel authorization goes, which the court relied on, that's all it is. It's a travel authorization. When they traveled from Mexico to my client's native Colombia, she signed another one. What's our standard of review? Is it de novo or clear error? Shared intent sounds like a question of fact, but what is the standard? I believe Larbi says that's a question of mixed question of law and fact, Your Honor. And I don't think the facts unequivocally, as Larbi points, describes, it points to the fact that the parties intended that her residence would be Mexico. Absent shared intent, the court has to look at the totality of the facts, the fact that the child remained there for however long it was. They traveled to other countries. My client sent money there regularly. My client visited her regularly. None of that evidence is an intent that the child was to remain in Mexico. Why did you find him to send money to Mr. Sierra if he was a drug dealer? Mr. Sierra claims he wasn't working. We don't know if that's true or not. But there was evidence in the record. My client sent hundreds and hundreds of dollars to support this child. She certainly did not abandon the child. And she wanted her back. When she went to Mexico, she found in the record, this is in the record, the dental records of that child, a 7-year-old child. Her teeth were rotting out of her head. She had seven cavities filled. She had head lice. She was emaciated. My client brought her back here. And as I told the district court in my opening statement, we denominated this more as a rescue than a removal. And that's what it was. I have to say that I've been a member of the Bar of Southern Texas for 30 years. And to see that child taken from her mother's arms with the clothes on her back by a federal marshal and summarily removed from the courtroom was one of the most heartbreaking things I've ever seen. And my client is devastated by this. Well, no doubt. But what happened in all the years preceding? I believe I've covered that. The child was down there for the purposes of speech therapy. How come? Since when does Mexico have better speech therapy than the U.S.? My understanding was there was not a program here available for the child. She was 3 years old at the time. But since she had a chance to go to Mexico and get this treatment, that's why she was there. Maybe that's because they were teaching her Spanish. No, she was having trouble learning to speak. I understand. Maybe that's because her only language was Spanish. No, I don't think so, Judge. Her English is not very good, though, I can tell you that. All right. I'm not trying to be crude. What really gets me is all the opportunities she had. For those 5 years, the child was down there, and she didn't take advantage of that to bring the child back. And all of a sudden, she wants the child back. Well, the child was actually down there a little over 3 years, I believe, Your Honor. And she finally did take that chance, like I said, when she went down there and found additional child support. But what about when they were both in Colombia? I mean, the way your brief portrays it, they were thinking they would get married. And then they had a big fight and decided not to get married, but she still sends the child back to Mexico. That's true, Judge. There was talk of marriage, but apparently not. Well, why didn't she take the girl baby with her at that time? That I don't know, Judge. I mean, in hindsight, certainly if I had been counseling her at the time, I would have said bring her back immediately. Well, I mean, you would think, you know, Judge Harmon is a mother, too, and you would just, whether you look at it from that perspective or rationally, it just seems sort of strange because then 6 months later, she spirits her away. She did, Your Honor, and as I said, that's due to the condition she found her in. Like I said, we thought this was a rescue, not a removal. I don't think the evidence is sufficient. Again, I would urge that the Court should have granted our motion to dismiss on forum non-communiens. Not only was the State District Court an available and adequate forum, it was the only forum that could have subsided this issue. With all due respect, I don't think you can create parentage by estoppel. State law is clear that the procedures outlined under the uniform. This isn't, quote, estoppel. As Judge Clements said, it's judicial estoppel. I'm not sure I understand what you mean, Judge. Because she acknowledged in court that the guy, she said, he's the father. Judge, I guess just saying it don't make it so. This is increasingly common in family law cases. This should have been a big red flag to the person that filed this case. Where the parents are not married, the issue of parentage is almost certainly going to arrive. The issue should have been filed in state court to begin with, and that's where it belongs. Well, you have an opportunity for rebuttal. Very well, Your Honor. Thank you. Mr. Moser, you can probably tell that the court is always uncomfortable with these Hague cases because of the family law implications, and certainly we are not experts in family law. Thank you, Your Honor. That was going to be my first point. But let me just, if I could, just digress for a second, correct a couple things he said. He said that the child went back to Mexico because she needed speech therapy. There's nothing in the record about that. He talked about dental records and lice and malnutrition. Again, there's nothing in the record about that. He's said that, but there's nothing in the record about it. Now — That didn't come up in the trial at all? There's no testimony about it. Pardon me? There's no testimony about it. Okay. Okay. There's no medical records at all about any of this. Now, let me talk about the — I think you've covered it pretty much. Let me talk about the parentage issue, that parentage is an issue for the state court, and the Hague Convention Court is not supposed to decide family law issues like the best friend support, only to decide whether the child was wrongfully taken. And it applies to anyone who has — who is exercising rights of custody under the law of the country in which a child is habitually residing. It is not confined to parents, although, as someone pointed out, it usually is the parents. Well, you'd have to have custody. That's right. You have to have custody rights. And Judge Harmon said that he was exercising rights under Mexican law, and that has never been challenged in the brief salience argument. Now, he said we should have had a parentage hearing first, and I've never seen a Hague Convention case that says, well, you have to stop until there's some State court hearing on parentage. But let's say I'm wrong about that. What you need to consider is exactly what is the point of a parentage hearing. The birth certificate says he's the father. In his pleadings in Judge Harmon's court, he admitted he was the father. She admitted in court. And to follow up on Judge Jones, your point about mothers, what mother or father is, she would let someone to whom she's not married and who is not the other parent of the child take the child away from her voluntarily for two years to live in Mexico. It just — that's not — I've seen a lot of mothers and fathers. I've never seen one that would act that way. And one other thing on the parentage issue, which we haven't covered, I think someone mentioned about, well, he could get a DNA test. This was a case brought in Montgomery County. What he didn't mention is that Mr. Jaimes — by the way, Jaimes is his last name. Sierra is his mother's name. Okay. And Primitivo is his middle name. So in Hispanic cultures, the — Jaimes. Okay. Thank you. Okay. I was confused about that myself. So he was voluntarily deported. He can't come back to the United States. And we had to go through elaborate procedures in district court, which I think are unprecedented, to actually get him to the facility in Mexico where he — his testimony could be heard by the district court, and he could hear all the questions. Was that by teleconference or video? It was by video. It was very elaborate. And Mr. Caswell, my co-counsel, was very instrumental in setting that up, and I'm very appreciative to him. And so he can't come back to the United States. One of the reasons this hearing took so long to actually come to fruition was the difficulties in setting this up, because no one had ever done it before. So he can't come back to the United States. So suppose there is a hearing in Montgomery County. He hadn't been served on that, of course. And I think someone — But we understand that. Okay. And one more thing. On the DNA — you know, why doesn't he take a DNA test? I'd refer to the court to Section — I don't think it's in the brief — Section 160503 of the Family Code. It talks about genetic testing in paternity cases. And it says the testing has to be performed by a testing laboratory accredited by the American Association of Blood Banks, the American Society of Histocompatibility and Immunogenics, if I'm saying that right. In other words, you can't do it in Mexico. That's right. I mean, a judge in Montgomery County can't order him to come to Texas to take a DNA test. So he can't take a DNA test beside the fact, as I've already said, is what — What is the mother's profession? Does she have a job? I don't think that's in the record. Nothing in the record about — I'm just wondering. I don't think so. Mr. Jones can correct me on that, but I don't think there is. Is anything in the record about her sending hundreds and hundreds of dollars to Mexico? She testified about that. There is testimony about that. What's the father's job? Last time I talked to him, he was in the — he was a trucker. He drove — drives trucks. That's the last time I talked to him, which is — Nothing in the record about it? The record doesn't reflect that? It reflects some jobs he had in Mexico. It reflects some jobs he had when he lived in North Carolina. I don't think it reflects what he's doing now. So to get to the other issue, which has been mentioned and which I want to discuss, is the habitual residence issue, because the Hague Convention says that if you have rights of custody under the law of the child's habitual residence, and the Court found without question that he was exercising rights under the law of Mexico. So the question is, was Mexico her habitual residence at the time of the — when the mother came down there? He likes to call this a rescue. It's — I mean, kidnapping or abduction is the more proper word. And I think that hearing — that finding of fact by Judge Harmon, I think it's — it goes by clearly Arroni's standard. That's my understanding. And not only is that hearing — not only is that finding not clearly Arroni's, it's consistent with the overwhelming weight of the evidence. In fact, if Judge Harmon had ruled that the United States was the child's permanent residence in 2014, I'd be standing here telling you that finding was clearly Arroni's. Because the only evidence that the child's habitual residence was the U.S. was the mother's completely unsubstantiated statement that her permission to let the father take the child to Mexico was not meant to be permanent. But every piece of evidence supports that, and we've talked about this. The mother signed an authorization allowing him to take the child to Mexico. One-way ticket. Without that authorization, he couldn't leave the country with her. He was being voluntarily deported. That authorization has no end date. The father turns over all his accounts in the United States to the mother. The mother comes to Mexico at the end of 2012, stays for, I think, a month, makes no effort to take the child back. The mother visits in Mexico, June of 2013, stays a few days, makes no effort to take the child back. The mother comes in July of 2013 for the child's fourth birthday, stays, I think, a month or six weeks. Again, same conclusion. Then at the end of 2013, they meet again in Colombia. There was some talk about getting married, but they didn't. And then the father brings the child back to Mexico, but only after the mother signs another travel authorization, without which the father would not have been able to leave Colombia with the mother. If the mother wanted the child to live outside of Mexico, this was as good an opportunity as she's ever going to get. And she didn't take it. The child goes back to Mexico. The father registers the kid for school, keeps her medical records up to date with her pictures of the child's room with all the toys and belongings, many of which the mother brought to Mexico when the mother came down there. And then, now, that sounds to me like the two parents have decided the child's permanent residence was Mexico. I don't know how clear it could be. Mother didn't need a travel authorization from the father to bring the child from Mexico back to Texas? I'm sorry. I missed that. When the mother brought the child back to Texas, you call it a kidnapping, they call it a rescue removal. She didn't need a travel authorization to travel with the child signed by the father? Well, I don't know if she needed one, but she certainly didn't have one. They just got — to my understanding, they got on a bus in the middle of the night and drove up through Brownsville. Okay. And I don't think they needed an authorization. The child was an American citizen. I don't think she needed an authorization to come back to the United States. I think that if you want to look at this case of, you know, what's the best place for the child to live, the answer is I don't know. I don't think we'll ever know. There are certainly good arguments that might be made on both sides. But if you look at this case from the law, there's no — it's a very easy decision. Judge Harmon made the right decision, and this Court should uphold that decision. I still have time left, and I'd be happy to answer any questions. Otherwise, I'll be back to balance my time. I don't think so.  Thank you. Thank you, Judge. Judge Henry Buttle, first of all, it is in the record, I believe, that my client is employed as a hotel maid and has been continuously the entire time she's been in Texas. As to no evidence on the child's condition, the dental records were admitted into evidence, and those should be before the Court now. Do you have a record cite? I don't, Judge. It was an exhibit that was submitted in the trial court and transmitted to this Court. Again, we get back to this issue of rights of custody, and I can't help thinking that while the Hague Convention doesn't especially discuss parentage, I think as Judge Jones observed, it almost assumes parentage. Well, that's something we can't assume here, I don't believe. What if we're wrong? What if you're . . . If he's not the biological parent, then it seems to me your client is really skating on thin ice with regard to the falsity of her testimony and your positions. Well . . . So that's one problem. And the other problem is that if, quote, parentage is an issue in many of these becomes an issue, and I've seen another, at least one other Hague Convention case in this Court that involved divorce or, you know, illegitimacy or something, then parentage can be thrown up as a roadblock that effectively prevents the operation of the Hague Convention in many cases. I don't see how it could, Judge. The State court has concurrent jurisdiction to hear these matters, just as this Court does. Yes, but typically one client, one, I mean, almost exclusively, the contests arise because one party is outside the United States. Well, certainly, and that would be the basis for the action, Judge. Yeah. But again, I think people's rights of custody exist as the Hague Convention says. These must arrive from a legal relationship. And whether her saying that he's the child's father, that doesn't necessarily make it so. I practice a lot of family law, and this is a common occurrence. As I said, I'm not an expert in family law, but your client did allow this little girl to live with Mr. Jimes for three or four years. That's true, Judge. And I think the cases say that the period of time the child spends in the other country is not necessarily determinative of those facts. The district court relied principally on three things here, the travel authorization, which, as I said, was nothing more than that. What about the one from Columbia? Most countries require that now. I understand that as of 2012, Mexico no longer does, and I believe that's on the DHS website. But so my point is there's one from North Carolina and one from Columbia as well, which is much more contemporaneous. I'm not sure if the law in Columbia is, but out of an abundance of caution, generally when my clients travel out of the country, we get a written authorization just to avoid any confusion about why the child is leaving the country. The district court relied on three factors primarily. The child was in school in Mexico. Well, she was in school here. Also, they thought about buying a house there. Well, no real estate deal was ever consummated. And the travel authorization. The travel authorization is nothing more than that, travel. Travel is both ways. But my concern is if we're wrong here, if we are wrong, and that this guy is not the child's father, what have we done? We have condemned this child to a lifetime. Isn't that a custody issue? Well, that's not really so. She's an American, and as soon as she turns 16, she can put herself, I mean I'm saying 16 because she can run away from home, she can put herself back on the bus and go right back to the U.S. I think to the extent Mr. Sierra has her under his thumb, that's not very likely. What do you mean by that? Mr. Sierra, from the testimony, is a very controlling person. My client went there. He had locked her in the house with the child. This is not a good guy. Well, she wasn't exactly jumping up and down screaming for those three years he had the child. That just cuts against all that. That's true, Judge. But I think the important fact is she did go down there and she did retrieve the child based on the conditions she found her living in. We would ask the Court in closing to reverse this case, remand it back to the district court with orders to vacate the order and dismiss the case. All right, Judge. Thanks very much, Your Honor. Thank you, sir. The Court will stand in recess until 9 o'clock tomorrow morning.